# N. Y. COMMON PLEAS.

## GURDON BUCK agt. FRANCIS H. AMIDON.

It is a general principle pervading the law of *agency* that one who procures services to be done for another, is not himself chargeable as the debtor, unless he omits to make known his principal, or erroneously supposes that he has authority, or exceeds his authority, or expressly or impliedly engages to be answerable, either by directly promising to pay for them, if rendered, or by doing or saying something which justifies the person who is to perform them, in supposing that the one who applies to him engages to pay for them.*

This principle applied in the present case, where the defendant took a telegram to the plaintiff—a surgeon in the city of New York, from the family physician of the defendant's brother in Connecticut, who had, in pursuance of such telegram, a surgical operation performed by the plaintiff, and the defendant, also a resident of the city of New York, went with the plaintiff to Connecticut, and paid the plaintiff's railroad fares, but as appeared from the evidence, said nor did nothing beyond the duties of an agent that would make him liable for the services performed by the plaintiff for his brother.

*General Term, June,* 1870.

THERE is no conflict in respect to the facts in this case. There may be some little variation or difference between Dr. Buck and the defendant's account of what occurred between them, but nothing that could materially affect the case. It is only that difference ordinarily found between two persons in narrating the same transaction, but not any difference as to the facts, which as narrated by both are substantially the same.

The defendant's brother J. C. Amidon, who was a resident of Groton in Connecticut, had an affection of the bladder for which he was attended by a Dr. Francis, of New London, and while the doctor was engaged in drawing the patient's water by means of a cathetar, the cap or button of the instrument broke off and the cathetar passed into the bladder a very unusual circumstance, and which involved the

necessity of a very delicate and skillful operation to extract the cathetar. The family was alarmed at the accident and requested the doctor to send to New York for a surgeon, by telegraph, and " to make the thing sure" to send the dispatch to the patient's brother, F. H. Amidon, the defendant, as " he would be sure to deliver it." Dr. Francis accordingly sent a dispatch to the defendant, in these words: "New London, Nov. 20, 1869, 2 p.m., to Francis Amidon, 649 Broadway, N. Y. Don't fail to come and bring a surgeon to-night. GURDON BUCK, M.D., 121 Tenth street. Please come immediately, elastic cathetar lost in the bladder of patient, possibly also stone. If you cannot come please direct to the most suitable surgeon. Dr. FRANCIS. Please answer, but don't fail to come with a surgeon." It was a dispatch alike to the defendant and Dr. Buck, or as Dr. Francis testified, he sent two dispatches, which were probably united in one.

Immediately upon receiving the dispatch, the defendant went to the residence of Dr. Buck, the plaintiff, who is an eminent surgeon in this city, and told him that he had received a telegram from his brother's physician requesting him to bring up a surgeon that might relieve his brother, living opposite New London (Groton), who had got a cathetar in his bladder, and taking out the dispatch he read it to the plaintiff. He asked the plaintiff if he knew Dr. Francis, his brother's physician, and the other said, " no, but that he may have met him." Upon which the defendant replied, that he must have heard of some operation of his, from his directing the defendant to call upon him, to which the plaintiff answered, that he was somewhat unknown as a surgeon. The defendant then said, " the question is, can you go," and the plaintiff after some hesitation said " yes." The defendant then advised him, that there was a train that evening at 8 p.m., that if he could go the defendant would go with him, and it was arranged that they should meet at the depot. The defendant then went away, and

apprehending there might be some misunderstanding, returned and left the telegram with the plaintiff in order as he said, that he might understand Dr. Francis' better than he did, and they exchanged a few words concerning the appointment for the evening train at 8 o'clock. Nothing was said about who was to pay the plaintiff. The defendant testified that he did not consider that he had any discretion in the matter, and the plaintiff testified that when the dispatch was left with him he took it to the light in his office and seeing it was addressed to F. H. Amidon, he referred to directory and finding he said, that the person who called upon him was Mr. Amidon, the hatter, he took it for granted that he was dealing with a responsible party.

The plaintiff and the defendant met, pursuant to the appointment, in the evening, at the depot, and went up together to Groton, defendant paying Dr. Buck's fare, upon the doctor's arrival at three o'clock in the morning he examined the patient and during that day the operation, which is elaborately detailed in the evidence, was successfully and very skillfully performed by him, to the great relief of the patient, and to the satisfaction of the attending physician and of all parties.

The plaintiff testified that he noticed, that the patient was living upon a moderate scale, and that he was taken by surprise to be sent for so far by a man living apparently upon a moderate scale ; that he considered that people in straitened circumstances do not send to distant cities for eminent medical service unless they are able to pay for it, or unless they have friends who can, and that he took into consideration that New England people should not be taken by their appearance, and knew that the patient, had kind friends who could be responsible for extra medical services.

Upon the evening of the day of the operation and shortly before the departure of the plaintiff the defendant's brother sent for him and requested him to ask the doctor for his bill, which the defendant accordingly did.

The plaintiff replied that it did not matter about present-ing a bill then, and gave the defendant a piece of paper with these words written upon it, " Dr. Buck, 46 West 29th Street, $400. The defendant then went into his brother's room, told him what the doctor's bill was and he expressed great surprise. The defendant returned and told the doctor that his brother thought it was a very large bill, and that he must remember that his brother was not a rich man, and the doctor answered that he supposed that people who could send for a surgeon that distance were rich, or as the plaintiff testified, he replied, that he had taken that into consideration ; that he was not accustomed to go away and render service except upon such terms; that he had rendered a very important service and saved the patient from a very serious operation which would have been necessary, if the plaintiff had not succeeded, as he did; which was the first occasion upon which anything had passed between the defendant and the doctor upon the subject of his re-muneration.

The doctor then left, and eight days afterward he sent a bill to the defendant in which the patient was named as the debtor. It was in these words, "New York, Nov. 29, 1869, Mr. J. C. Amidon, Groton, Conn. to Dr. Gurdon Buck, Dr. No. 46 West 29th Street. To professional services, surgical operations at Groton, Conn., &c. &c., $400," which the plaintiff says he sent to the defendant as he supposed that the brother in New York, was the proper channel to send the bill to, and on the 4th of December following, the plaintiff sent to the patient the following letter : "Mr. J. C. Amidon, Groton, Conn. Dear sir, after waiting a reasonable time without hearing *from you*, I beg leave to remind you that it is customary to settle such accounts as mine, for professional services rendered at a distance, promptly. Hoping it will receive your early attention, I remain," &c.

This letter was followed by letters between the plaintiff and Dr. Francis of New London, and by a letter from the

patient, and a note from the defendant as indicated in the following letter which the plaintiff addressed to the patient on the 14th of December, 1869.

" Mr. J. C. Amidon. Dear sir, I beg to acknowledge your favor of the 9th instant, and to inform you that your brother addressed me a note yesterday offering me one hundred and fifty dollars in settlement of my bill for professional services. I wrote Dr. Francis in reply to a letter received from him last week, and in consideration of explanation made by him, I expressed my willingness to make a concession of $100, in settlement of my bill; I desired him to communicate the contents of my letter to you, and supposing him to have done so, I received your last proposal with no little surprise. I am not disposed to conform my terms to *your* idea of liberal remuneration, and have not been accustomed after rendering important services, especially at a distance, to submit to conditions the design of which seems to be to determine how little may be got off with. I shall still adhere to my terms of $300, and hope there may be no further delay in settling. Very respectfully," &c.

The plaintiff testified that $500 would have been his charge, but for the circumstances in which he found the defendant's brother living; and two eminent surgeons, Doctors Parker and Van Buren testified that $500 would have been a reasonable charge. Upon this state of facts, the judge left it to the jury to determine who employed the plaintiff, or upon whose account and credit the services were rendered, and the jury found a verdict for the plaintiff for $400. The defendant appealed.

IRA D. WARREN, *for appellant.*

I. The question as to whether the credit was given to the patient or to his brother, the defendant, was a question of law. There is not the slightest conflict of evidence on that

subject. Both the plaintiff and defendant agree exactly as to what occurred when the defendant called on him, and therefore it becomes a question of law. (*Pratt* agt. *Foot*, 9 *N Y.*, 465).

II. When a man calls on a physician at the request of a sick friend, and requests the physician to pay his friend a visit, stating who the services are for, showing the physician a letter requesting him to call, and the full particulars of it, and the physician does call and renders the service at the patient's house, sends the patient a bill for the service, writes the patient letter after letter requesting payment, makes the charges light, as he testifies, because the patient lives on a moderate scale, it cannot be true, as a question of law, that the physician can afterwards sue for his bill the friend who did the errand.

The statement of the proposition of itself is argument enough to refute it; yet we will refer the Court to a few of the cases which settled this question before any of the parties to this suit were born.

1*st.* "It is a general rule, standing on strong foundations and pervading every system of jurisprudence, that when an agent is duly constituted, and names his principal, and does not . exceed his authority, the principal is responsible, and not the agent. The agent becomes personally liable only when the principal is not known, or when there is no responsible principal, or when the agent becomes liable by an undertaking in his own name, or when he exceeds his powers." (2 *Kent's Comm.*, 630; 1 *American Leading Cases*, 614; *Smith's Mercantile Law*, 144, sec. 7.)

In the case of *Owen* agt. *Gooch*, (2 *Esp.*, 567), "Gooch gave the order for the work, and told the plaintiff it was for Tipple, and the work was done by the plaintiff at Tipple's house." Lord KENYON, "the mere act of ordering goods for another, does not make the person giving the order liable. Whenever an order is given by one person for another, and he informs the tradesman who that person is, for

whose use the goods are ordered, he thereby declares himself to be merely an agent, and there is no foundation for holding him liable." This is the settled doctrine of all the cases from that time to this. (*Dunlap's Paly on Agency*, 369, 370, *cases cited in note, d; Story on Agency*, § 261, § 289, *note; Costigan* agt. *Vanland*, 12 *Barb.*, 458; *Stanton* agt. *Camp*, 4 *Barb.*, 278; *Dana* agt. *Monroe*, 38 *Barb*, 528; *Colvin* agt. *Holbrook*, 2 *Comst.*, 120,

In this case the plaintiff was shown the telegram, and was informed of all the circumstances. The defendant gave the order for his brother, J. C. Amidon. The services were rendered to J. C. Amidon at his house. The bill was made out to J. C. Amidon. It was made $400 only, on account of his moderate style of living. The letters show that the credit was given to J. C. Amidon. Mr. J. C. Amidon is perfectly able to pay the bill.

There is not a word of conflict in the evidence on this question.

We therefore say, that the learned justice erred in submitting this case to the jury.

It was in reality submitting the question of law to the jury, and their decision of it is about as intelligent as could be expected.

Juries are to decide conflicting questions of fact, and not questions of law; and there was no conflict of evidence, except as to the *value* of the service.

Should this judgment be sustained, and the doctrine established that a man who, to oblige his friend, calls and requests a doctor to go and see him, must pay that doctor's bill; particularly where he discloses all the facts, as in this case, we may soon expect to see the streets infested by men afflicted with all the diseases to which human flesh is heir, in pursuit of their own doctors.

Perhaps, for the benefit of some of the patients, such a rule might be of more benefit than the doctors' nauseous

doses; but, for the patient's friend, such a rule would be the most nauseous dose of all.

We are confident, however, that no such rule can be sustained on principle or authority.

III. We ask that this judgment be reversed.

CHAS. W. BETTS *for respondent.*

*By the Court,* DALY, C. J.—It is suggested in answer to the appeal, that the question to whom the credit was given, was one of the intentions of the parties, as deduced from the facts and circumstances, and that the jury having drawn the deduction that the services were rendered upon the credit of the defendant, their verdict should not be disturbed. Where, upon an uncontroverted state of facts, the point involved remains doubtful, or upon undisputed facts inferences may be drawn either way, the question is properly one for the jury, and their finding should be conclusive; in all such cases, the unanimous concurrence of the twelve minds in the jury box is as satisfactory a mode of reaching a right conclusion, as to attempt to work it out by legal deductions or logical reasoning. But in all such cases there must be something in the evidence to found the conclusion upon, and in this case I fail to discover anything showing or tending to show, that the defendant ever did or said anything to warrant the plaintiff in assuming before he went to Groton, and before he performed the operation, that the defendant was to pay him for his services. It would be preposterous to say that a person who brings a message to a surgeon from the attending physician of a patient, requesting him to come and perform an operation upon the patient, is, by the mere delivery of such a message, chargeable with the obligation of paying the surgeon for his services. He is a mere agent and nothing more, unless he communicates the message in such a way, or does, or says something that

fairly warrants the surgeon, before he undertakes the service, in supposing that he is the person who is to pay for it, and in this respect it can make no difference that the bearer of the message happens to be a brother of the patient.

It is a general principle pervading the law of agency, that one who procures services to be done for another is not himself chargeable as the debtor, unless he omits to make known his principal or erroneously supposes that he has authority, or exceeds his authority, or expressly, or implicitly engages to be answerable either by direct promising to pay for them if rendered ; or by doing or saying something which justifies the person who is to perform them, in supposing that the one who applies to him engages to pay for them. The law is too well settled in this respect to make it necessary to refer to authorities, and the direct application of it to the facts now before us may be illustrated by the case to which the appellant has called our attention. (*Owen* agt. *Gooch*, 2 *Esp.*, 567.)

The plaintiff was a paper hanger, and the defendant gave him an order for paper, and work to be done in the way of his business in the house of one Tippel, the plaintiff being informed, when the order was given, that the work was on Tippel's account, and the entry upon the plaintiff's book being " Mr. Tippel, by order of Gooch." It was argued in that case, as it is in this, that the person for whom the work was done may have been unknown to the plaintiff, but the defendant Gooch was known to him, and that under such circumstances, the work must be deemed to have been ordered on his credit, and that he was consequently liable.

The answer of Lord KENYON may be quoted as pertinent in its general bearing to the present case. He said, " if the mere act of ordering goods was to make the party who ordered them liable, no man could give an order for a friend in the country, who might request him to do it, without risk to himself. If a party orders goods from a tradesman, though in fact they are for another, if the tradesman is

not informed at the time that they were for the use of another, he who ordered them is certainly liable, for the tradesman must be presumed to have looked to his credit only.* * But whenever an order is given by one person for another, and he informs the tradesman who the person is, for whose use the goods are ordered, he thereby declares himself to be merely an agent, and there is no foundation for holding him to be liable."

In the present case, the defendant exhibited and left with the plaintiff, the dispatch he had received, and the plaintiff admitted upon the trial that the defendant told him that the patient therein referred to was his brother. He was therefore informed beforehand of the person on whom the operation was to be performed, and the argument of the plaintiff's counsel upon this appeal, that the plaintiff knew nothing about the defendant's brother, not even his name, made no inquiries about him or his responsibility, and hence could not have contracted for his services upon his credit, is sufficiently answered by the remark above quoted from Lord KENYON.

This is all the defendant did, except to pay the plaintiff's fare to New London; but this was after the doctor had come to the railroad, prepared to go to Groton and perform the operation, and was in itself too slight a circumstance upon which to found an implied engagement to pay the plaintiff for his services.

But the case is not only destitute of any act upon the part of the defendant which would justify the plaintiff in assuming, when he consented to go, that the defendant was to pay him, but his own acts then and subsequently show that it was the patient, and not defend, ant that he looked to for the payment of his bill. Before leaving he consulted the directory and found that the person who called upon him was Mr. Amidon, the hatter, when he, he says, took it for granted that he was dealing with a responsible party; but that the one whom he took it for granted was

a responsible party was the patient upon whom he was to perform the operation, is shown by his own statement upon the trial, that when he reached Groton, he " was taken rather by surprise, to have been sent for so far by a man living upon a moderate scale," but " took it into consideration that New England people should not be taken by their appearance," a presumption in the application of which he may still be right, for there is nothing in the case to show that the defendant's brother was not a responsible person, and able to pay the amount which the plaintiff claimed. All that the case shows is, that he complained that it was too large, and that he offered through his brother to pay a smaller sum.

All the plaintiff's subsequent acts like the preceding, show that it was the person upon whom the operation was performed that he looked to for the payment of his bill. He made it out to him, and sent it to the brother here in New York, because, to use his own words, he supposed that was " the proper *channel* to send it to." That he considered the defendant simply as a channel through which to send the bill to the debtor, is shown by the fact, that after eight days had elapsed without its being paid, he sent a letter, not to the defendant, but to the patient, and advised him that he waited a reasonable time without hearing *from him*, and in the next letter of December, 14, he writes to the patient, " I received *your* last proposal (the $150,) with no little surprise, I am not disposed to conform my terms to *your* ideas," and he ends by hoping that there may be no further delay in settling. All this conclusively shows to whom the credit was given and by whom, from the beginning, he supposed he was to be paid.

In the question, which arises so frequently under the statute of frauds, to whom was the credit given in case when the point is, whether the promise was collateral to answer in default of another, on an original undertaking, great weight is attached to the fact that the plaintiff has

charged the debt upon his books, or made out the bill, to the person who received the goods, to show the promise of the defendant was simply collateral, and therefore, void for not being in writing. *(Anderson* agt. *Hayman,* 1 *H. B. L.,* 121; *Dixon* agt. *Frazee,* 1 *E. D. Smith,* 34; *Sarson* agt. *Wyman,* 14 *Wood,* 246; *Broome on Statute of Frauds,* § 198).

It is not absolutely conclusive, as it may be shown, that it was done by mistake. (*Loomis* agt. *Smith,* 17 *Conn.,* 115); but it is a most material, and without explanation, a controlling circumstance; for as my former colleague, Judge WOODRUFF remarked in *Dixon* agt. *Frazee,* suppose the plaintiff thereby puts his own construction upon the agreement. Such was the case here. The plaintiff made out his bill against the defendant's brother, and nothing appearing to show that this was done by mistake, or any explanation given why he did so. The same construction would be given to so material a circumstance as was given in the cases above quoted, so that if even the defendant had promised the plaintiff, the understanding would be collateral and void under the statute, not being in writing.

After going carefully over the evidence, I can find nothing in it to support the verdict, and in my judgment it, should be set aside.